UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------
:
LAURA ZILIOLI,                        :
                                      :          17cv9495
                    Plaintiff,        :
                                      :          OPINION & ORDER
        -against-                     :
                                      :
CITY OF NEW YORK, *et al.*,            :
                                      :
                    Defendants.       :
                                      :
------------------------------

WILLIAM H. PAULEY III, Senior United States District Judge:

> Laura Zilioli brings this federal civil rights action against the City of New York
(the "City"), Police Officer Annette Vasquez, and Sergeant John Lugo (together, "Defendants").[1]
Zilioli also asserts a state law claim against the City for negligent hiring and supervision. The
City and Vasquez move for summary judgment dismissing this action pursuant to Federal Rule
of Civil Procedure 56. Zilioli cross-moves for partial summary judgment as to the state law
claim. For the reasons that follow, the parties' motions for summary judgment are granted in
part and denied in part.

BACKGROUND

I.      May 17, 2017 Incident

> On May 17, 2017, Zilioli visited the New York City Human Resources
Administration office ("HRA" or "HRA office") in Manhattan to pick up a check. (City Defs.'

---

[1]      In its memorandum of law, the City noted that: "[P]ursuant to the provisions of Section 50-k of the New
York General Municipal Law, and based on a review of the facts of the case, the Corporation Counsel determined
that it would not represent Lugo i[n] this action." (Mem. of Law in Supp. of City Defs.' Mot. for Summ. J., ECF
No. 75 ("Defs.' Mem. of Law"), at 1 n.1.) Although the Court refers to Lugo throughout this Opinion, this Court
acknowledges that he has not appeared. Additionally, a review of the docket indicates that Zilioli has not served
Lugo with the Third Amended Complaint.

Resps. and Objs. to Pl.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 104 ("Defs.' 56.1"), ¶¶ 1–2.) When HRA personnel informed Zilioli that her check was unavailable, she became upset and began raising her voice. (Am. Resp. to Defs.' Rule 56.1 Statement and Pl.'s Supp. Rule 56.1 Statement of Undisputed Facts, ECF No. 116 ("Pl.'s 56.1"), ¶¶ 70–71.) Lugo, an HRA Supervising Special Officer, approached Zilioli and asked her to leave the HRA office. (Pl.'s 56.1 ¶ 72.) When Zilioli refused, Lugo—along with Vasquez—handcuffed Zilioli and arrested her for trespass pursuant to New York Penal Law ("N.Y.P.L.") § 140.05. (Pl.'s 56.1 ¶¶ 73–77.)

After escorting Zilioli to the HRA security office, Vasquez searched Zilioli and Lugo conducted a warrant check. (Pl.'s 56.1 ¶¶ 78–79.) Lugo discovered that Zilioli had an active I-card (indicating she was a person of interest in an ongoing criminal investigation) from the New York City Police Department's 6th Precinct and an arrest warrant for failing to appear in Manhattan Criminal Court. (Pl.'s 56.1 ¶ 81.) Lugo directed Vasquez to change into her uniform. (Pl.'s 56.1 ¶ 83.) When Vasquez left the office, Lugo and another security guard were present with Zilioli. (Pl.'s 56.1 ¶ 85.) According to Zilioli, Lugo then dismissed the other security guard so that he was alone with her. (Defs.' 56.1 ¶ 6.) After locking the security office door, Lugo sexually assaulted Zilioli. (Defs.' 56.1 ¶ 7; Pl.'s 56.1 ¶ 87.)

After the assault, Lugo unlocked and opened the security office door. (Pl.'s 56.1 ¶ 88.) When Vasquez returned to the security office, she found Lugo and another security guard present with Zilioli. (Pl.'s 56.1 ¶ 89.) Lugo directed Vasquez to patrol the HRA office. (Pl.'s 56.1 ¶ 90.) When Vasquez returned to the security office for the third time, she found Lugo and Washington Camilo, another security guard, present with Zilioli. (Pl.'s 56.1 ¶ 93.) Vasquez and Captain Kevin Kenniff then escorted Zilioli to Manhattan Criminal Court to answer the

outstanding warrant. (Pl.'s 56.1 ¶¶ 92, 95–96.) During her transport, Zilioli never mentioned to Vasquez that Lugo sexually assaulted her. (Pl.'s 56.1 ¶ 97.)

Later that day, Lugo asked Vasquez to prepare an incident report, including information about Zilioli's arrest, detention, and release. (Pl.'s 56.1 ¶¶ 100–01.) After reviewing Vasquez's report, Lugo directed her to re-write it and state specifically that he was never alone with Zilioli. (Pl.'s 56.1 ¶¶ 102–03.) Vasquez discarded her initial report, but did not include that statement in her revised report. (Pl.'s 56.1 ¶¶ 102, 105.) Instead, Vasquez wrote that a security guard, Washington Camilo, was present with Lugo and Zilioli when she returned to the security office after completing her patrol. (Pl.'s 56.1 ¶ 105; Decl. of Bridgette Nunez-Figueroa in Supp. of City Defs.' Mot. for Summ. J., ECF No. 77 ("Nunez-Figueroa Decl."), Ex. R, at DEF007.) At her deposition, Vasquez elaborated: Each time she entered or left the security office a security guard was present with Lugo. (Pl.'s 56.1 ¶¶ 85, 89, 91, 93, 95.) Vasquez did not learn of the sexual assault complaint until after May 17, 2017. (Pl.'s 56.1 ¶¶ 106–07.)

On May 23, 2017, Zilioli filed a complaint against Lugo with HRA's WeCare Program. (Pl.'s 56.1 ¶ 109.) On September 18, 2017, Lugo was arrested and charged with committing a Criminal Sexual Act in the First Degree in violation of N.Y.P.L. § 130.50(1). (Pl.'s 56.1 ¶ 111.) Lugo pled guilty and was sentenced to five years of imprisonment in July 2018. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 ¶¶ 117, 120.) He is currently incarcerated.

II.     The City's Hiring Process

At the time Lugo applied for employment, the New York City Department of Citywide Administrative Services ("DCAS") required candidates for the position of Special Officer to complete an application listing all convictions (and/or pending charges), explain any criminal history, affirm the veracity of the application, and acknowledge that that any false

statements (or intentional omissions) may subject them to disqualification or prosecution. (Pl.'s 56.1 ¶¶ 7–10.) In his DCAS application, Lugo indicated that he had a May 2008 conviction for disorderly conduct, which was conditionally discharged. (Pl.'s 56.1 ¶ 30.) Lugo explained that this conviction stemmed from an incident in which he was arrested for disorderly conduct in the Bronx for having a loud argument with his son's mother. (Pl.'s 56.1 ¶ 31.) Lugo did not divulge that while he pled to disorderly conduct, he was arrested for Assault in the Third Degree, Resisting Arrest, and Harassment in the Second Degree after striking his son's mother. (Pl.'s 56.1 ¶¶ 31, 36; Decl. of Michael F. Rubin in Supp. of Pl.'s Cross Mot. for Partial Summ. J., ECF No. 86 ("Rubin Decl."), Ex. H., at DEF1468–69.)

Kelly Jones-Alexis, a DCAS associate investigator, reviewed Lugo's application for completeness. (Defs.' 56.1 ¶¶ 17–18, 21.) Consistent with DCAS policy, Jones-Alexis obtained additional criminal history information on Lugo. (Pl.'s 56.1 ¶¶ 11–12, 34–36.) That information included a copy of the criminal complaint against Lugo regarding his May 2008 assault charge. (Pl.'s 56.1 ¶ 36.) After reviewing Lugo's file, Jones-Alexis classified him as "qualified for consideration." (Defs.' 56.1 ¶ 37.)

The parties dispute various aspects of Jones-Alexis's investigation, including: (1) her discretion in making candidate recommendations, (Defs.' 56.1 ¶ 37; Pl.'s 56.1 ¶ 14); (2) whether she noticed any discrepancy in Lugo's application regarding his arrest record, (Defs.' 56.1 ¶¶ 22–25; Pl.'s 56.1 ¶¶ 39, 42); and (3) if she took any action after discovering the discrepancy, (Defs.' 56.1 ¶ 25; Pl.'s Reply to Defs.' Additional Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 107 ("Pl.'s 56.1 Reply"), ¶¶ 68–69, 92–93). Jones-Alexis did not note any discrepancy or false statement in Lugo's application file. (Defs.' 56.1 ¶ 27.)

Thereafter, Lugo was placed in the civil service hiring pool, and following an interview, HRA extended an offer for a Special Officer position subject to his satisfactory completion of the rest of the hiring process. (Pl.'s 56.1 ¶ 44.) HRA conducted an administrative review of Lugo's application because of his prior conviction. (Pl.'s 56.1 ¶¶ 23, 51.) It does not appear that HRA obtained a copy of the May 2008 criminal complaint. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 46; Rubin Decl., Ex. L, at DEF256.) HRA Assistant Deputy Commissioner of Police Operations Dexter Freeman ("Assistant Deputy Commissioner") authorized HRA's hiring of Lugo. (Pls.' 56.1 ¶¶ 52–53.) In making that hiring decision, Freeman testified that he only considers criminal convictions in evaluating an applicant's qualifications. (Pls.' 56.1 Reply ¶¶ 106–07.) HRA hired Lugo in September 2012. (Pl.'s 56.1 ¶ 56.)

## III.  Complaints Against Lugo

On March 6, 2015, HRA's Special Investigations Division received a complaint that Lugo falsely arrested someone and subjected that individual to excessive force. (Pl.'s 56.1 Reply ¶ 110.) HRA did not initiate an investigation of that complaint until March 7, 2017. (Pl.'s 56.1 Reply ¶ 112.) Eight days later, on March 15, 2017, HRA's Special Investigations Division received a second complaint alleging excessive force by Lugo. (Pl.'s 56.1 Reply ¶ 113.) Less than a month later, on April 14, 2017, a third complaint was lodged against Lugo and other security officers, alleging excessive force in effecting an arrest at the HRA office. (Pl.'s 56.1 Reply ¶ 114.) On April 25, 2017, Lugo was interviewed concerning the March 7 and 15 complaints. (Pl.'s 56.1 Reply ¶ 115.) On April 28, 2017, a fourth complaint was filed against Lugo alleging another false arrest. (Rubin Decl., Ex. P, at DEF524–28.) On June 12, 2017, Lugo was interviewed concerning the April 14 and 25 complaints. (Pl.'s 56.1 Reply ¶ 116; Rubin Decl., Ex. P, at DEF526.) All of these complaints were closed as "unsubstantiated"

because of a lack of evidence or the unwillingness of victims to communicate with investigators. (Pl.'s 56.1 Reply ¶¶ 117–18; Rubin Decl., Ex. P, at DEF527.)

Zilioli advances two claims: (1) a federal claim against Defendants for conspiracy to violate her civil rights under 42 U.S.C. § 1983, and (2) a state law claim against the City for negligent hiring and supervision.  (Third Am. Compl., ECF No. 95 ("TAC"), ¶¶ 54–60.)

DISCUSSION

I.    <u>Legal Standard</u>

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  <u>Baez v. JetBlue Airways Corp.</u>, 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted).  This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ."  <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1060– 61 (2d Cir. 1995).  If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 250 (citation and quotation marks omitted); <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  <u>Hicks v. Baines</u>, 593 F.3d

159, 166 (2d Cir. 2010) (citation and alterations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 83 (2d Cir. 2001).

Generally, when parties file cross-motions for summary judgment, the same standard applies. <u>Morales v. Quintel Entm't, Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." <u>Morales</u>, 249 F.3d at 121. However, since the motion and cross-motion seek a determination on the same issue, this Court may consider them together. <u>ExteNet Sys., Inc. v. Vill. of Pelham</u>, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019); <u>Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC</u>, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).

## II.  <u>Conspiracy Under 42 U.S.C. § 1983</u>

Zilioli alleges that Defendants "conspired to violate [her] civil rights by agreeing among themselves to commit acts . . . in violation of 42 U.S.C. § 1983, for which defendants are individually liable." (TAC ¶ 60.) The City and Vasquez argue that Zilioli's conspiracy claim is barred by the intracorporate conspiracy doctrine. Alternatively, they assert that Zilioli fails to establish any facts that Vasquez entered into a conspiracy with Lugo to deprive Zilioli of her constitutional rights.[2]

---

[2]     Originally, Zilioli brought her civil rights conspiracy claim under 42 U.S.C. § 1985. (Second Am. Compl., ECF No. 31 ("SAC"), ¶¶ 123–24.) After the City and Vasquez moved for summary judgment dismissing that claim on the basis that Zilioli had not alleged any racial animus, (Defs.' Mem. of Law, at 9), this Court granted her leave to re-plead, (ECF No. 94).

To support a claim under § 1983 for conspiracy, a plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." Pangburn, 200 F.3d at 72 (quotation marks omitted). Because "[§] 1983 is only a grant of a right of action[,] the substantive right giving rise to the action must come from another source." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995). Therefore, a § 1983 conspiracy claim "will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right." Singer, 63 F.3d at 119 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970)).

As a threshold issue, it is unclear what federal right undergirds Zilioli's conspiracy claim. Originally, Zilioli asserted claims for battery,[3] false arrest, and malicious prosecution. (SAC ¶¶ 99–122.) However, she withdrew those claims, (ECF No. 67), and the TAC is elliptical at best. Now, on summary judgment, Zilioli maintains that the underlying constitutional violation is a denial of access to the courts. (Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J., ECF No. 100, ¶ 3; Oct. 22, 2019 Oral Arg. Tr. at 4.) There is no material fact in dispute concerning the existence of a conspiracy to deny Zilioli access to the courts. [4]

---

[3] While the SAC labels the causes of action "Battery – Pursuant to 42 U.S.C. § 1983," (SAC ¶¶ 99–104), these appear to be claims for excessive force. See Posr v. Doherty, 944 F.2d 91, 95 (2d Cir. 1991) ("[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical.").

[4] Although not briefed by either party, to the extent Zilioli intended her cover-up as a "backward-looking" access to courts claim, this argument is unavailing. See Christopher v. Harbury, 536 U.S. 403, 413–14 & n.11 (2002) (noting that "backward-looking" access to courts cases "cover[] claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future"). The Second Circuit has emphasized that "[t]he viability of [such] claims is far from clear in this Circuit." Sousa v. Marquez, 702 F.3d 124, 128 (2d Cir. 2012). Moreover, "such claims are available

First, corporations generally cannot conspire with their employees or agents under the intracorporate conspiracy doctrine.  See Girard v. 94th St. & Fifth Ave. Corp., 530 F.2d 66, 70–72 (2d Cir. 1976); see also Everson v. N.Y. City Transit Auth., 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) (collecting cases applying intracorporate conspiracy doctrine to public entities). That leaves Lugo and Vasquez as the only co-conspirators.[5]  But both were part of a single entity—the City of New York.  Under the intracorporate conspiracy doctrine "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (quotation marks omitted).  While the Second Circuit has applied this theory to § 1985 claims, see Herrmann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978), it has "not yet had occasion to decide whether the doctrine also applies to conspiracy claims under [§] 1983," Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013).  Nonetheless, district courts have typically applied the logic of the intracorporate conspiracy doctrine to § 1983 claims.  See, e.g., Anemone v. Metro. Transp. Auth., 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) ("In the absence of controlling contrary authority, this court will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound."); see also Chamberlain, 986 F. Supp. 2d at 388 (collecting cases).

---

only if a judicial remedy was completely foreclosed" by the alleged cover-up.  Sousa, 702 F.3d at 128 (quotation marks omitted). Here, the fact that Vasquez discarded her initial incident report and substituted a revised report did not completely foreclose Zilioli's "ability to bring [her] other constitutional claims, and the filing of the instant suit would belie any such argument."  McNaughton v. de Blasio, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015), aff'd, 644 F. App'x 32 (2d Cir. 2016); see also Brown v. Volpe, 2017 WL 985895, at *4 (S.D.N.Y. Mar. 13, 2017) (dismissing access to courts claim where plaintiff "has filed a civil action—this very action—against both [defendants]" who allegedly tampered with evidence that would help plaintiff's action against them).

[5]    Even if the intracorporate conspiracy doctrine does not apply to the City here, "[a] municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of respondeat superior."  Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (citing Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 691 (1978)).  And to the extent Zilioli brings her § 1983 conspiracy claim against the City, she neither alleges nor argues a Monell claim.

Zilioli argues that Lugo and Vasquez's conduct fits within "[a]n exception to the intracorporate conspiracy doctrine [that] allows suits against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." Dowd v. DeMarco, 314 F. Supp. 3d 576, 588 (S.D.N.Y. 2018) (quotation marks omitted); see also Little v. City of New York, 487 F. Supp. 2d 426, 442 (S.D.N.Y. 2007) (noting an exception to the intracorporate conspiracy doctrine "where the individuals are motivated by an independent personal stake in achieving the corporation's objective" (quotation marks omitted)). Since "[s]imply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation[,] [t]he plaintiff must also allege that [the officers] acted other than in the normal course of their corporate duties." Girard, 530 F.2d at 72 (first alteration in original) (quotation marks omitted).

There is little doubt that Lugo was acting outside of the scope of his employment when he sexually assaulted Zilioli. See Doe v. Alsaud, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context."). As a result, the City declined to represent Lugo. And Lugo's direction to Vasquez that she re-write her incident report, noting that he was never alone with Zilioli, was undoubtedly aimed at covering up his unconstitutional actions.

But Zilioli fails to raise any material issue of fact regarding the existence of an agreement between Lugo and Vasquez to violate her constitutional rights.[6] It is undisputed that

---

[6] This Court need not decide whether the intracorporate conspiracy doctrine is in fact applicable here. While some courts in this Circuit have required allegations that every defendant be motivated by a personal interest in carrying out the alleged unconstitutional conduct, others have taken issue with this proposition. Compare Tardd v. Brookhaven Nat. Lab., 407 F. Supp. 2d 404, 414 (E.D.N.Y. 2006) ("[W]hether the exception applies in this case depends on whether each and every defendant is alleged to have been motivated by a personal interest in carrying out the alleged discrimination."), with Alvarez v. City of New York, 2012 WL 6212612, at *3 n.30 (S.D.N.Y. Dec. 12, 2012) (noting that "[t]he Court respectfully disagrees" with the notion that every defendant must be motivated

each time Vasquez was in the presence of Lugo and Zilioli, there was at least one other person present.  (Pl.'s 56.1 ¶¶ 85, 89, 91, 93, 95.)  And while Vasquez re-wrote her incident report, she declined to include the language that Lugo wanted and only vouched for those occasions when she was physically present with Zilioli.  (Pl.'s 56.1 ¶¶ 103, 105; Nunez-Figueroa Decl., Ex. R, at DEF007.)  Moreover, Vasquez did not learn about the sexual assault until sometime later in May.  (Pl.'s 56.1 ¶ 107; Nunez-Figueroa Decl., Ex. Q, at 98.)

Viewing the evidence in the light most favorable to Zilioli, she has failed to set forth specific facts showing a genuine issue for trial on her civil conspiracy claim.  See, e.g., Bertuglia v. City of New York, 133 F. Supp. 3d 608, 640–41 (S.D.N.Y. 2015) (granting defendants' motion for summary judgment on § 1983 conspiracy claim because the "claim founders on the lack of evidence to show an unconstitutional object of any agreement between [the defendants]" and finding that "plaintiffs have failed to articulate the violation of a specific constitutional right that was the alleged object of the conspiracy"); see also Chamberlain, 986 F. Supp. 2d at 389 ("Plaintiff has provided no facts suggesting a prior agreement between the individual Defendants or other evidence of a collective desire to deprive [Plaintiff] of any constitutional rights."); Alvarez, 2012 WL 6212612, at *2–4 (concluding that while the intracorporate conspiracy doctrine did not apply to police officers' alleged cover-up, plaintiff nonetheless failed to sufficiently allege a conspiracy claim causing a constitutional violation).

Therefore, Defendants' motion for summary judgment is granted and Zilioli's § 1983 conspiracy claim is dismissed.

---

by a personal stake).  Nonetheless, because conspiracy claims require two or more participants, see generally Girard, 530 F.2d at 70, the doctrine likely does not apply here.

III.   State Law Claim

   A.  Supplemental Jurisdiction

       Zilioli also brings a claim for negligent hiring and supervision against the City

under New York State law.  Given dismissal of the only federal claim, this Court must consider

whether it has subject matter jurisdiction.  See Fed. R. Civ. P. 12(h)(3).  "This includes whether

the Court should exercise supplemental jurisdiction over state law claims."  See Diaz v. Viagran,

2018 WL 4360790, at *12 (S.D.N.Y. Aug. 29, 2018) (citing Star Multi Care Servs., Inc. v.

Empire Blue Cross Blue Shield, 6 F. Supp. 3d 275, 293 (E.D.N.Y. 2014)).

       A district court may decline to exercise supplemental jurisdiction over a claim if

"the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. §

1367(c)(3).  "Under this prong, in a great many cases, the evaluation will usually result in the

dismissal of the state-law claims."  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 83

(2d Cir. 2018) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).  But even

when all federal claims are dismissed prior to trial, "the district court must still meaningfully

balance the supplemental jurisdiction factors."  Catzin, 899 F.3d at 86.  Therefore, since

§ 1367(c)(3) applies here, "a district court should not decline to exercise supplemental

jurisdiction unless it also determines that doing so would not promote the values . . . [of]

economy, convenience, fairness, and comity."  Jones v. Ford Motor Credit Co., 358 F.3d 205,

214 (2d Cir. 2004) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966)).

       When weighing these factors, courts consider "(1) the length of time the matter

has been pending before the federal court; (2) the proximity of the trial date; and (3) the

predominance of issues of federal, as opposed to local, concern."  Drexel Burnham Lambert Inc.

v. Saxony Heights Realty Assocs., 777 F. Supp. 228, 240 (S.D.N.Y. 1991) (citing McLearn v. Cowen & Co., 660 F.2d 845, 848 & n.2 (2d Cir. 1981)).

Here, Zilioli commenced her action in December 2017, over two years ago. Both parties have conducted discovery and fully briefed opposing motions for summary judgment. Since only one issue will remain following this Court's analysis, a trial can be scheduled in due time. While the parties quarrel over certain aspects of the foreseeability analysis of New York State negligent hiring and supervision claims, federal courts routinely handle these claims. This Court concludes that, on balance, the considerations of judicial economy, fairness, and comity weigh in favor of exercising supplemental jurisdiction. See Catzin, 899 F.3d at 83 (noting that the Second Circuit has "upheld the exercise of supplemental jurisdiction even when all federal-law claims were eliminated prior to trial, for example, in long-pending cases presenting no novel issues of state law where discovery had been completed, dispositive motions had been submitted, and the case would soon be ready for trial" (quotation marks omitted)).

B. Negligent Hiring and Supervision

Zilioli and the City duel for summary judgment as to Zilioli's claim for negligent hiring and supervision. Zilioli claims that the City was negligent in its hiring and supervision of Lugo. (TAC ¶¶ 54–58.) The City counters that Zilioli fails to raise an issue of material fact, and that in any event, the City is entitled to governmental immunity.

To state a claim for negligent hiring, training, supervision, or retention under New York law, "in addition to the standard elements of negligence, a plaintiff must show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's

premises or with the employer's chattels." Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam) (citations and quotation marks omitted); Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 463–64 (S.D.N.Y. 2012). "A cause of action for negligent hiring . . . requires allegations that the employer . . . failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." Bouchard v. N.Y. Archdiocese, 719 F. Supp. 2d 255, 261 (S.D.N.Y. 2010) (second alteration in original) (quotation marks omitted). Additionally, "[t]o maintain a claim against a municipal employer for the negligent hiring, training, and retention of a tortfeasor under New York law, a plaintiff must show that the employee acted outside the scope of [his] employment." Velez v. City of New York, 730 F.3d 128, 136–37 (2d Cir. 2013) (quotation marks omitted).

Here, the first and third elements of the Ehrens test are not in dispute—Lugo was employed by the City and he sexually assaulted Zilioli at the HRA office. There is also no disagreement that Lugo acted outside the scope of his employment.

With respect to the negligent hiring claim, Zilioli cannot demonstrate a triable issue of fact that the City failed to properly investigate Lugo or that the City "knew or should have known" of Lugo's propensity to commit sexual assault. First, there is no dispute that the investigator assigned to Lugo's case conducted a background check in accord with DCAS regulations, including collecting information on Lugo's criminal history. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 ¶¶ 34–36.) While Zilioli attempts to manufacture a dispute about whether the investigator knew of Lugo's misstatement on his DCAS application, she acknowledges in her Local Rule 56.1 Statement that the investigator was aware. (Pl.'s Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 85, ¶ 22 ("Prior to her sending out a letter to the NYPD seeking

records regarding Lugo's May 2008 arrest, [the investigator] was already aware that Lugo lied on his job application."), ¶ 23 ("[The investigator] received a document from the Bronx County Courthouse confirming that Lugo lied on his application.").)  But whether or not the investigator was aware that Lugo lied is immaterial because misstatements on DCAS applications do not automatically disqualify applicants from further consideration.  (Rubin Decl., Ex. H, at DEF1429, 1448.)  And Lugo's HRA application was subjected to an additional administrative review because of his prior convictions, (Pl.'s 56.1 ¶¶ 23, 51), which belies the assertion that the City failed to conduct a thorough review of Lugo's application before hiring him.

Second, although the issue of assault specificity is relevant here, Lugo's prior conviction was for disorderly conduct, not assault.  (Pl.'s 56.1 ¶ 30.)  That conviction is too far removed and not "admissible evidence from which a reasonable juror could infer that the [City], at any time prior to the relevant incident, knew or should have known of [Lugo's] propensity to assault [individuals] or otherwise to engage in inappropriate sexual conduct" approximately nine years later.  Ehrens, 385 F.3d at 235; see also Estevez-Yalcin v. Children's Vill., 331 F. Supp. 2d 170, 176 (S.D.N.Y. 2004) ("[A] mere possibility of improper conduct is insufficient to impose liability since, historically, liability for negligence has been determined by what is probable, not merely by what is possible." (quoting N. X. v. Cabrini Med. Ctr., 719 N.Y.S.2d 60, 65 (App. Div. 2001))); Williams v. State of New York, 969 N.E.2d 197, 199 (N.Y. 2012) (finding "State was entitled to dismissal of [negligence] claim because it established, as a matter of law, that any negligence on its part was not a proximate cause of [plaintiff's] injuries" when alleged negligent conduct occurred two years prior to the assault on plaintiff).

Assuming arguendo that the City acted negligently, it would nevertheless be entitled to judgment as a matter of law because governmental immunity shields municipalities

from conduct involving discretionary decisions.  Under New York State law, governmental immunity—and therefore absolute immunity—attaches "when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." Haddock v. City of New York, 553 N.E.2d 987, 991 (N.Y. 1990); see also Valdez v. City of New York, 960 N.E.2d 356, 361 (N.Y. 2011) ("[T]he common-law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions.").  First, to determine whether an actor's position involves discretion or whether the role is ministerial, a court must conduct a "functional analysis" to discern whether the actor's position is "sufficiently discretionary in nature to warrant immunity."  Mon v. City of New York, 579 N.E.2d 689, 692 (N.Y. 1991).  Second, because "governmental immunity does not attach to every action of an official having discretionary duties," a court must determine "whether the conduct giving rise to the claim is related to an exercise of that discretion."  Mon, 579 N.E.2d at 692.

Here, Lugo went through a multi-step employment process beginning with a DCAS background check and ending with an HRA hiring decision.  The facts of this case are similar to those in Mon, where a plaintiff sued the City for negligent hiring of a police officer who shot the plaintiff while off-duty.  Mon, 579 N.E.2d at 690.  The police officer in Mon omitted from his application a 1979 arrest stemming from an incident at a drug store that involved property damage and a shot fired by his companion.  Mon, 579 N.E.2d at 691.  That arrest resulted in a conviction for disorderly conduct.  Mon, 579 N.E.2d at 691.  After conducting a thorough background check, the investigator in Mon recommended approval of the police officer's hire.  Mon, 579 N.E.2d at 691.  After reviewing the investigator's recommendation and the candidate's file, the supervisor approved the hiring.  Mon, 579 N.E.2d at 691.

The New York Court of Appeals analyzed the functions of the investigator and his supervisor and determined that their "responsibilities . . . for investigating and evaluating the background and qualifications of police officer candidates and making the recommendations and final decisions for such appointments entailed the exercise of some judgment and discretion." Mon, 579 N.E.2d at 692.  Additionally, the court found that both individuals' conduct—and the ultimate decision to hire the police officer—involved discretionary decisions based on an exercise of their judgment.  Mon, 579 N.E.2d at 692–93.

Zilioli argues that the investigator's role was "ministerial" because she lacked the discretion to make ultimate hiring recommendations.  But her role was not materially different from the investigator in Mon.  And she similarly exercised her discretion to make a recommendation to her supervisor.  Moreover, the parties do not dispute that the Assistant Deputy Commissioner's responsibilities involve discretion.  (Reply Mem. in Supp. of Pl.'s Cross-Mot. for Partial Summ. J., ECF No. 106, at 5.)  And as to exercising that discretion, the Assistant Deputy Commissioner noted that he only considered job applicants' convictions when making hiring decisions.  (Pls.' 56.1 Reply ¶¶ 106–07.)  Although he later testified that hiring Lugo was a mistake, he made a judgment at the time by weighing the information before him.  See Mon, 579 N.E.2d at 693 ("[I]t is evident that the claim for negligently hiring [the defendant], despite the known unfavorable information as to his character, essentially arises from a misjudgment that was discretionary.").  Thus, both the investigator and the Assistant Deputy Commissioner's decisions were an exercise of discretion entitling the City to governmental immunity.

Zilioli also brings a claim for negligent supervision.  The elements for negligent supervision are the same as those for negligent hiring.  Ehrens, 385 F.3d at 235.  Further, "[a]

claim for negligent supervision or retention arises when an employer places an employee in a position to cause <u>foreseeable</u> harm, harm which the injured party most probably would have been spared had the employer taken reasonable care in supervising or retaining the employee." <u>Doe v. Montefiore Med. Ctr.</u>, 2013 WL 624688, at *3 (S.D.N.Y. Feb. 19, 2013) (quoting <u>Vione v. Tewell</u>, 820 N.Y.S.2d 682, 687 (Sup. Ct., N.Y. Cty. 2006)), <u>aff'd</u>, 598 F. App'x 42 (2d Cir. 2015). "Actual or constructive notice to the [employer] of prior similar conduct generally is required." <u>Nevaeh T. v. City of New York</u>, 18 N.Y.S.3d 415, 418 (App. Div. 2015) (quotation marks omitted). "If complaints have been made against an employee in the past, the employer is on notice about the complained-of behavior." <u>Doe v. City of New York</u>, 2018 WL 6095847, at *7 (S.D.N.Y. Nov. 21, 2018); <u>see also</u> <u>Tainsky v. Clarins USA, Inc.</u>, 363 F. Supp. 2d 578, 586 (S.D.N.Y. 2005) ("The only way in which an employer can be held liable for negligent supervision is if the employer had prior notice of an employee's assaults or other propensities and failed to take action to protect other employees.").

Once again, the parties dispute whether the City "knew or should have known" of Lugo's propensity to commit sexual assault. The parties' disagreement is understandable because "New York law appears to take differing approaches relating to foreseeability in cases alleging that sexual assault by an employee was foreseeable to the employer." <u>Doe v. Montefiore Med. Ctr.</u>, 598 F. App'x 42, 43 (2d Cir. 2015) (summary order). While some courts require plaintiffs to "offer evidence that the employer knew (or should have known) of the employee's propensity . . . to engage in inappropriate sexual conduct," other courts require evidence that the "employer knew (or should have known) of the employee's propensity to engage in physical assault, whether or not such conduct was of a sexual nature." <u>Montefiore Med. Ctr.</u>, 598 F. App'x at 43 (alteration in original) (citations and quotation marks omitted).

This Court agrees with other courts in this Circuit and multiple New York State courts that "[a]n employer does not need to have notice of an employee's propensity 'to behave in the exact manner in which he behaved with' a plaintiff in order for liability to attach, 'only notice of [the employee's] propensity for that sort of behavior.'" Doe, 2018 WL 6095847, at *7 (quoting Anna O. v. State, 2011 WL 6957587, at *7 (N.Y. Ct. Cl. Oct. 19, 2011)); Adorno v. Corr. Servs. Corp., 312 F. Supp. 2d 505, 519 (S.D.N.Y. 2004); Haybeck v. Prodigy Servs. Co., 944 F. Supp. 326, 332 (S.D.N.Y. 1996); Doe v. Goldweber, 976 N.Y.S.2d 77, 78 (App. Div. 2013) ("An employer may be liable for negligent hiring when it knew or should have known of the employee's propensity to commit injury even if the injury committed was not identical to the prior injury."); T.W. v. City of New York, 729 N.Y.S.2d 96, 98 (App. Div. 2001) ("[I]t cannot be said that, as a matter of law, it is unforeseeable that a person with convictions for assault would commit a sexual assault."); see also Doe by & through Doe v. E. Irondequoit Cent. Sch. Dist., 2018 WL 2100605, at *28 (W.D.N.Y. May 7, 2018) (acknowledging that while "New York law is not entirely clear" on this issue, "an employer must at least have notice of the employee's propensity to commit the general type of injury," and noting that "an employer may be liable for a sexual assault committed by the employee, even if it was only aware that the employee had a propensity to commit physical assaults generally"); Dawn VV v. State of New York, 850 N.Y.S.2d 246, 249 (App. Div. 2008) ("Although defendant may not have been aware that a sexual assault was likely to occur if residents were left unsupervised, it was foreseeable that a resident could engage in some type of physical assault against another resident.").

Here, Zilioli raises a genuine issue of material fact as to whether the City knew or should have known about Lugo's propensity for the sort of behavior that ultimately caused Zilioli's injuries. The HRA Special Investigations Division received four complaints against

Lugo that included allegations of excessive force and false arrests, including multiple instances of physical assault. (Pls.' 56.1 Reply ¶¶ 110–18; Rubin Decl., Ex. P, at DEF524–28.) And before being sexually assaulted, Zilioli testified that Lugo grabbed her and threw her on the floor to handcuff her. (Nunez-Figueroa Decl., Ex. B, at 65.) The earlier complaints against Lugo, while not alleging any sexual conduct, create a triable issue of fact as to whether Lugo's violent behavior put the City on notice that he might commit an assault. See, e.g., Doe, 2018 WL 6095847, at *7 ("Even a single previous report of misconduct may be sufficient to create an issue of fact regardless of the severity of the previous incident."); Bliss v. Putnam Valley Cent. Sch. Dist., 2011 WL 1079944, at *5 (S.D.N.Y. Mar. 24, 2011) (denying summary judgment for negligent supervision claim where a teacher's prior actions making a female student uncomfortable created an issue of fact as whether a school should have known of the teacher's propensity to commit sexual assault); cf. Offei v. Omar, 2012 WL 2086294, at *5 (S.D.N.Y. May 18, 2012) ("As the Supreme Court has noted, the crime of sexual assault is inherently violent in nature and, even if not accompanied by violence, may inflict serious psychological damage on the victim." (citing Coker v. Ga., 433 U.S. 584, 597–98 (1977))), report and recommendation adopted, 2012 WL 2086356 (S.D.N.Y. June 8, 2012).

The City was investigating those complaints when Lugo assaulted Zilioli, but it is unclear what the City knew (or should have known) and whether Lugo's conduct warranted further investigation. The first claim, arising in 2015, was not investigated for nearly two years for reasons that are unexplained. The other complaints all arose within a span of a few months immediately preceding Lugo's assault of Zilioli. And the last of those complaints was lodged against a group of officers, including Lugo, who were effecting an arrest. The unanswered questions surrounding the investigations of these earlier complaints raise an issue for a jury to

consider.  Compare Adorno, 312 F. Supp. 2d at 520 (finding halfway house was on notice of "the

sort of behavior which caused the injured party's harm" when rape victim informed halfway

house employee that she was being harassed two weeks earlier), with Tsesarskaya, 843 F. Supp.

2d at 464 ("Summary judgment is appropriate where there is no proof that the employer . . .

acted negligently in hiring, training, supervising or retaining an employee.").[7]

   Finally, the City asserts that it should be shielded by governmental immunity

because the investigations into Lugo were pending at the time of the assault and were deemed

"unsubstantiated."  First, "New York courts have rejected the argument that state or municipal

governments [are] not on notice of their employees' propensity for injurious conduct when the

complaints [are] 'unsubstantiated.'"  Doe, 2018 WL 6095847, at *7 (citations omitted).  Second,

while immunity may insulate municipalities for the performance of duties which involve

discretion, when "the retention of an employee may involve a known risk of bodily harm to

others, the field in which [official] discretion may be exercised . . . is superseded by the duty to

abate that risk if in related circumstances danger to others is reasonably to be perceived."

McCrink v. City of New York, 71 N.E.2d 419, 422 (N.Y. 1947).  Here, while the parties provide

a voluminous record on Lugo's hiring, there are disputed facts as to whether the City followed its

own internal procedures—and thus exercised discretion—when investigating his conduct.  And

since there are disputed issues of fact, summary judgment is inappropriate based on the

governmental immunity defense alone.  See, e.g., Tatum v. City of New York, 2009 WL 124881,

at *12 (S.D.N.Y. Jan. 20, 2009) (denying summary judgment because there were disputed issues

---

[7]  The parties also dispute the "proximate cause" element of standard negligence claims and the relevance of the existing HRA policy.  Most of these issues overlap with their arguments regarding the foreseeability of Lugo's assault.  And under New York law, proximate cause is normally an issue for the factfinder to resolve in negligence actions.  See Gonzalez v. Caballero, 572 F. Supp. 2d 463, 469 (S.D.N.Y. 2008); Gonzalez v. City of New York, 17 N.Y.S.3d 12, 15 (App. Div. 2015).

of fact as to plaintiff's underlying claims against the City); <u>Bradley v. City of New York</u>, 2007 WL 232945, at *12 (S.D.N.Y. Jan. 26, 2007) (holding that summary judgment was inappropriate on good faith and governmental immunity defense because there were disputed issues of fact as to reasonableness of defendants' conduct); <u>see also</u> <u>Montanez v. City of Syracuse</u>, 2019 WL 315058, at *13 (N.D.N.Y. Jan. 23, 2019) ("A municipality is not, therefore, entitled to summary judgment based on immunity if there is a question of fact as to whether the employees' conduct at issue violated applicable procedures.")

Therefore, this Court grants the City's motion for summary judgment on the negligent hiring claim, denies Zilioli's motion on the same issue, and denies both parties' motions on the negligent supervision claim.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment dismissing the § 1983 civil conspiracy claim and the claim for negligent hiring under New York law is granted. That branch of Defendants' motion for summary judgment dismissing the negligent supervision claim under state law is denied. Plaintiff's motion for summary judgment is denied in its entirety. The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 73 & 78.

The parties are directed to appear for a status conference on May 7, 2020 at 10:30 a.m. The conference will be conducted telephonically. Defendants' counsel shall make all arrangements for the conference call and inform this Court of the dial-in information at least two days prior to the scheduled call by filing a letter on ECF.

Dated: April 1, 2020
     New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.